## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) Court No. 25-00004 |
| UNITED STATES, | ) ) ) |
| *Defendant,* | ) ) |
| and | ) ) |
| PRINX CHENGSHAN TIRE (THAILAND) CO., LTD., | ) ) ) |
| *Defendant-Intervenor.* | ) ) ) |

## ORDER

Upon consideration of Plaintiff's Rule 56.2 motion for judgment on the agency record, the responses in opposition, and all other papers and pleadings herein, it is hereby

**ORDERED** that the motion is granted, and it is further

**ORDERED** that the challenged decision of the U.S. Department of Commerce is remanded for reconsideration in accordance with this opinion.

_____
Hon. Gary S. Katzmann, Judge

Dated: _____, 2025
        New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) Court No. 25-00004 |
| UNITED STATES, | ) ) |
| *Defendant,* | ) ) |
| and | ) ) |
| PRINX CHENGSHAN TIRE (THAILAND) CO., LTD., | ) ) ) |
| *Defendant-Intervenor.* | ) ) ) |

## PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Plaintiff" or "USW") hereby moves for judgment on the agency record in its appeal of the final determination by the U.S. Department of Commerce ("Commerce") in the antidumping investigation of truck and bus tires from Thailand, published as *Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 89 Fed. Reg. 83,636 (Dep't Commerce Oct. 17, 2024) ("Final Determination"). As demonstrated in the accompanying memorandum in support of Plaintiff's motion for judgment on the agency

1

record, the factual findings and legal conclusions upon which the Final Determination is based are unsupported by substantial evidence and not in accordance with law. Therefore, Plaintiff respectfully requests that the Court grant Plaintiff's motion for judgment on the agency record, remand this matter to Commerce for disposition consistent with the opinion and order of the Court, and order any additional relief that the Court may deem just and proper.

Respectfully submitted,

 /s/ Luke A. Meisner
Roger B. Schagrin
Elizabeth J. Drake
Luke A. Meisner
Nicholas C. Phillips*

**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to USW*

*Admitted only in New York. Practice limited to matters before federal courts and agencies.

October 3, 2025

### UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) Court No. 25-00004 ) |
| UNITED STATES, | ) **PUBLIC VERSION** ) |
| *Defendant,* | ) **Business proprietary information** ) **removed from pp. 3-7, 13-16.** |
| and | ) ) |
| PRINX CHENGSHAN TIRE (THAILAND) CO., LTD., | ) ) ) |
| *Defendant-Intervenor.* | ) ) |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Luke A. Meisner
Elizabeth J. Drake
Nicholas C. Phillips*
**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
*Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

*Admitted only in New York. Practice limited to matters before federal courts and agencies.

October 3, 2025

## <u>TABLE OF CONTENTS</u>

I.   RULE 56.2 STATEMENT ............................................................................................. 0

   A.   Administrative Determination Under Review ................................................... 0

   B.   Issues Presented For Review ............................................................................ 0

II.   STATEMENT OF FACTS ......................................................................................... 1

III.   STANDARD OF REVIEW ........................................................................................ 8

IV.   SUMMARY OF THE ARGUMENT ......................................................................... 9

V.   ARGUMENT ........................................................................................................... 10

   A.   Legal Standard ................................................................................................ 10

   B.   Commerce's Decision to Treat Prinx as a Cooperating Party Was Unreasonable
      and Not Supported by Substantial Evidence ................................................... 12

VI.   CONCLUSION ........................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABB Inc. v. United States*, 355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ...................................... 11

*Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ....... 12, 18

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ....................................................... 9

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ...................................................................................................................... 13, 19

*BYD (H.K.) Co., Ltd v. United States*, 785 F. Supp. 3d 1359  (Ct. Int'l Trade 2025) ............. 3, 14

*Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137 (Fed. Cir. 1987) ........................ 9

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...................................................................... 9

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) .............................. 13

*F. Ili De Cecco Di Filippo Fara S. Martino S.p.A v. United States*, 216 F. 3d 1027 (Fed. Cir. 2000) ................................................................................................................................... 7, 13

*FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293 (2003) ................................................... 10

*Huvis Corp. v. United States*, 525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ............................... 10

*KYD, Inc.  v.  United States*, 607 F.3d 760 (Fed. Cir. 2010) ....................................................... 21

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ..................................................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* 463 U.S. 29 (1983) .............................. 9

*Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016) ...................... 11,13

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ............................. 12, 15, 18

*NSK Ltd. v. United States*, 481 F.3d 1355 (Fed. Cir. 2007) ........................................................ 13

*Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir. 1990) ................................ 12

*QVD Food Corp. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ........................................... 11

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ................................................................................ 9

*Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F. Supp. 2d 1339 (Ct. Int'l Trade 2005) ...................................................................................................................... 20

*Tianjin Magnesium Intern. Co., Ltd. v. United States*, 844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ................................................................................................ 13, 20

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ........................................ 9

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................ 9

19 U.S.C. § 1677b(e) ..................................................................................................... 2

19 U.S.C. § 1677b(e)(1)(B) ........................................................................................... 2

19 U.S.C. § 1677e(a) .................................................................................................... 12

19 U.S.C. § 1677e(b) ........................................................................................... 12, 14, 15

19 U.S.C. § 1677m(d) .................................................................................. 5, 12, 14, 16

**Other Authorities**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ................................ 13

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the People's Republic of China* (Jan. 17, 2017) ................................................................................................... 17

*Certain Cased Pencils from the People's Republic of China; Final Results and Partial Recession of Antidumping Duty Administrative Review*, 67 Fed. Reg. 48,612 (Dep't Commerce July 25, 2002) ....................................................................................................... 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) .............................................................................. 3

*Seamless Refined Copper Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 33,482 (Dep't Commerce June 12, 2015).... 3

*Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 89 Fed. Reg. 83,636 (Dep't Commerce Oct. 17, 2024) .............................................................. 1

*Truck and Bus Tires From Thailand: Initiation of Less-Than-Fair-Value Investigation*, 88 Fed. Reg. 77,960 (Dep't Commerce Nov. 14, 2023) ............................................ 2

On behalf of Plaintiff the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Plaintiff or "USW"), we hereby submit this brief in support of Plaintiff's motion for judgment on the agency record in the above-captioned action. For the reasons discussed below, Plaintiff respectfully requests that this Court hold that the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping investigation of truck and bus tires from Thailand is not supported by substantial evidence on the record and not otherwise in accordance with the law and that the Court therefore remand this matter to Commerce for disposition consistent with the decision of this Court.

## I.     RULE 56.2 STATEMENT

### A.  Administrative Determination Under Review

Plaintiff appeals Commerce's final determination and its calculation of the dumping margin for Prinx Chengshan Tire (Thailand) Co., Ltd. ("Prinx") in the antidumping investigation of *Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 89 Fed. Reg. 83,636 (Dep't Commerce Oct. 17, 2024) (P.R. 297) ("Final Determination") and accompanying Issues and Decision Memorandum ("IDM") (P.R. 290).

### B.  Issue Presented For Review[1]

1. Does substantial evidence support Commerce's finding that Prinx cooperated to the best of its ability in reporting its financial expense ratio based on a company operating in a market economy, despite Prinx's repeated and noncompliant attempts to report a ratio based on companies operating in a non-market economy?

   <u>Plaintiff's Position</u>: No.

---

[1] In its Complaint, Plaintiff brought three claims regarding Commerce's Final Determination. After additional deliberation, Plaintiff has decided not to pursue Count Two and Count Three as enumerated in the Complaint. Accordingly, this motion and accompanying brief present for review only the issue identified in Count One. *See* Complaint, ECF No. 10 (Feb. 7, 2025).

## II.    STATEMENT OF FACTS

On October 17, 2023, the USW filed a petition with Commerce alleging that truck and bus tires from Thailand were being sold at less than fair value. *See Petition for the Imposition of Antidumping Duties on Imports of Truck and Bus Tires from Thailand* (Oct. 17, 2023) (P.R. 1). Commerce initiated an antidumping investigation on November 14, 2023, and selected Prinx and Bridgestone Corporation as the mandatory respondents in the investigation. *See Truck and Bus Tires From Thailand: Initiation of Less-Than-Fair-Value Investigation*, 88 Fed. Reg. 77,960 (Dep't Commerce Nov. 14, 2023) (P.R. 56). Because the volume of Prinx's sales in its home market in Thailand was below five percent of its U.S. sales, Prinx's home market was not viable, and Commerce therefore determined the normal value of the subject merchandise based on constructed value. *See* 19 U.S.C. § 1677b(e); *Prinx Section A Questionnaire Response* (Jan. 17, 2024) at 2 (P.R. 107).

When conducting an antidumping investigation where normal value is based on constructed value, Commerce determines a respondent's costs to produce the subject merchandise in its home country. These costs include an amount for "selling, general, and administrative expenses…in connection with the production and sale of {the} foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(1)(B). As part of these expenses, Commerce calculates a respondent's financial expense ratio, or INTEX, which represents the cost of borrowed capital. For respondents that, like Prinx, are subsidiaries within a consolidated group of companies, Commerce calculates the respondent's financial expense ratio based on the audited financial statement of the company at the highest level of consolidation that includes the results of the respondent. *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic*

*of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) and accompanying Issues and Decision Memorandum at Comment 35. Commerce's practice reflects the fungibility of money and the parent company's ability to control the capital structure of subsidiaries in the group. *See id.*

When the company at the highest level of consolidation operates in a non-market economy ("NME"), however, Commerce does not rely on that company's financial statement to calculate INTEX. *See, e.g.*, *id; see also Seamless Refined Copper Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 33,482 (Dep't Commerce June 12, 2015) and accompanying Issues and Decision Memorandum ("*Copper Pipe and Tube from Mexico*") at Comment 3 (explaining that "we do not rely on the financial statements of companies operating in NMEs" and rejecting respondent's reporting because "the ultimate parent company, GD China, operates in the PRC, a NME."). This is because Commerce treats prices and costs in a non-market economy as inherently distorted and unreliable. *See Certain Cased Pencils from the People's Republic of China; Final Results and Partial Recession of Antidumping Duty Administrative Review*, 67 Fed. Reg. 48,612 (Dep't Commerce July 25, 2002) and accompanying Issues and Decision Memorandum at Comment 12; *see also BYD (H.K.) Co., Ltd v. United States*, 785 F. Supp. 3d 1359, 1378 (Ct. Int'l Trade 2025) ("The Tariff Act presumes that nonmarket-economy pricing is unreliable{.}"). In such a situation, Commerce calculates INTEX using other financial statements available on the record. *See Copper Pipe and Tube from Mexico* at Comment 3.

In its initial antidumping questionnaire, Commerce instructed Prinx to "report the per-unit net interest expense incurred by your company" at field INTEX. Commerce Antidumping

Questionnaire (Dec. 13, 2023) at D-20 (P.R. 77). Prinx responded that it was reporting its

financial expenses based on the net interest expense ratio of [

                                    ]. *Prinx Section D Questionnaire Response* (Feb. 5, 2024)

("Section D Response") at 30 (C.R. 178-196; P.R. 127). Using [                    ] financial

statement, Prinx reported [

                                    ]. *See id.* at Exhibit D-III-D-2

(reporting an interest expense ratio of [

        ]).

    Information on the record showed that [                    ] operated in [        ], a non-

market economy. For example, Prinx's response to Section A of Commerce's questionnaire

noted that [                                                    ]" and

listed a [                ] for the company. *See Prinx Section A Questionnaire Response* (Jan.

17, 2024) ("Section A Response") at 10 (C.R. 55-85; P.R. 107-111); *id.* at Exhibit A-2c-2 (C.R.

55-85; P.R. 107-111). Further, [                ] was [

                                    ]. *See id.* at Exhibit A-2c-1 (C.R. 55-

85; P.R. 107-111). This made [                    ] financial statement unsuited for the calculation

of Prinx's financial expense ratio.

    Because of the problems with using [                    ] financial statements, Commerce

issued a supplemental questionnaire instructing Prinx to revise its reporting of its financial

expense ratio. Specifically, Commerce instructed Prinx to (1) "clarify which company *operating

in a market economy* represents the highest level of consolidation with respect to the results of

{Prinx}"; (2) "{p}rovide a copy of the consolidated financial statements (including audit reports

and note) for the company named above for the fiscal year which most closely corresponds to the

{period of review}"; and (3) "{p}rovide a revised financial expense rate calculation based on the market economy financial statements at the highest consolidation level." *Prinx Section D Supplemental Questionnaire Response* (Apr. 22, 2024) ("Supp. Section D Response") at 12 (emphasis added), (C.R. 358-385; P.R. 184). Commerce therefore provided Prinx with notice of its deficient initial response and an opportunity to correct the deficiency by reporting in a supplemental response a financial expense ratio using information from a company operating in a market economy. *See* 19 U.S.C. § 1677m(d).

Prinx did not take this opportunity. Instead, it attempted to pass off yet another non-market economy company as an appropriate basis for reporting its financial expense ratio. This time, Prinx asserted that "[                                    ] is the company *operating in a market economy* and represents the highest level of consolidation with respect to the results of {Prinx}." Supp. Section D Response at 12 (emphasis added) (C.R. 358-385; P.R. 184). Prinx directed Commerce to [                ] financial statements and provided an updated financial expense ratio on that basis. *Id.* at 12 and Exhibit SD-12.c (C.R. 358-385; P.R. 184).[2]

[                ], like [                ], operated in [        ], a non-market economy, and therefore could not serve as the basis for Prinx's financial expense ratio calculation. The evidence of that fact was overwhelming and well-known to Prinx based on the information that Prinx itself placed on the record during the investigation. According to its subsidiary's financial statements, [

---

[2] On the basis of this revised reporting, Prinx's financial expense ratio became [        ]. Plaintiff submitted comments explaining that Prinx had erroneously reported a [                ] and that, on the basis of the information Prinx supplied, Prinx's financial expense ratio should be expressed as [        ]. *See* Letter to Commerce from USW re: *Pre-Preliminary Comments on Prinx Chengshan Tire (Thailand) Co., Ltd.'s INTEX Calculation* (May 2, 2024) (C.R. 435, P.R. 202). Prinx conceded this error. *See* Letter to Commerce from Prinx re: *Response to Petitioner's pre-preliminary comments on INTEX Calculation* (May 6, 2024) (C.R. 438, P.R. 206).

] Section A Response at Exhibit

A-6b-11_2 (C.R. 55-85; P.R. 107-111). Prinx's Section A questionnaire response listed [

], and identified [

]. *Id.* at Exhibit A-2c-2 and Exhibit A-6b-9_2, (C.R. 55-85;

P.R. 107-111). Further, [                    ] financial statements disclosed that the company

[

]. *Id.* at A-6b-10_2 (C.R. 55-85; P.R. 107-111). Finally, the

financial statements reflected [

]. *Id.* at A-6b-10_2 (C.R. 55-85; P.R. 107-111); Supp. Section D Response at

Exhibit SD-12.b (C.R. 358-385; P.R. 184).

It was, therefore, an indisputable and undeniable fact on the record known to Prinx that

[                    ] operated in [        ], a non-market economy. Nonetheless, based on Prinx's

false assertions, Commerce accepted Prinx's financial expense ratio calculation in its preliminary

determination and allowed [                    ] financial statements to serve as the basis for

Prinx's INTEX expense. *See* Commerce Memorandum re: *Cost of Production and Constructed*

*Value Calculation Adjustments for the Preliminary Determination – Prinx Chengshan Tire*

*(Thailand) Co., Ltd.* (May 14, 2024) at 2 (C.R. 446, P.R. 219) (adopting the [        ] rate

calculated from [                    ] financial statements).

After the preliminary determination, Plaintiff submitted a case brief alerting Commerce

to Prinx's false claims concerning its financial expense ratio and explained that [

], operated in [        ] and was thus ineligible to serve as the

5

basis for Prinx's financial expense ratio. *See* Petitioner's Case Brief, Truck and Bus Tires from Thailand (Sept. 16, 2024) ("Case Brief") at 38-44 (C.R. 563, P.R. 277). Plaintiff demonstrated that, despite receiving notice of its deficiency, Prinx "failed to provide information in the form and manner requested and to cooperate to the best of its ability with Commerce's instructions" and that Commerce should therefore calculate Prinx's financial expense ratio using AFA. *Id.* at 43 (C.R. 563, P.R. 277). To ensure that Commerce calculated Prinx's financial expense ratio using facts otherwise available that were actually adverse to Prinx, rather than neutral, Plaintiff proposed that Commerce double the financial expense ratio calculated for Bridgestone, the other mandatory respondent in the investigation, and apply it to Prinx in the final margin determination. *See id.* (C.R. 563, P.R. 277) (citing *F. Ili De Cecco Di Filippo Fara S. Martino S.p.A v. United States*, 216 F. 3d 1027, 1032 (Fed. Cir. 2000) for the proposition that "The purpose of {the AFA statute} is to provide respondents with an incentive to cooperate….").

In its rebuttal brief, Prinx claimed that Commerce had already "accept{ed}" its financial expense ratio calculation and "did not ask Prinx to submit additional information regarding the report in a second supplemental questionnaire." Prinx Rebuttal Brief (Sept. 20, 2024) at 25 (C.R. 564, P.R. 279). Prinx further claimed that [                    ] was a market economy entity because it was [                                                            ], and because [

       ]. *See id.* at 25-26 (C.R. 564, P.R. 279).

On October 9, 2024, Commerce issued its affirmative Final Determination. *See* IDM (P.R. 290). Regarding Prinx's financial expense ratio, Commerce disagreed that "Prinx failed to cooperate to the best of its ability to provide information in the form and manner requested by

Commerce" and "{did} not find the application of partial AFA to be warranted{.}" IDM at 47, 55-56 (P.R. 290).

This was not because Plaintiff's claims regarding [                    ] non-market economy operations were incorrect. In fact, Commerce agreed that "{a}fter further review of the information on the record of this proceeding, we agree with the petitioner that [

                    ] consolidated financial statements cannot serve as the basis for Prinx's financial expense ratio calculation in the final determination because this company also operates in an NME." IDM at 56 (P.R. 290). Nonetheless, Commerce declined to determine that Prinx had failed to cooperate to the best of its ability and instead filled the gap in the record resulting from Prinx's failure to provide an accurate INTEX ratio using neutral facts otherwise available. *See id.* (P.R 290). The neutral facts otherwise available Commerce chose were Prinx's own 2023 financial statements. *See id.* (P.R. 290).

Regarding Prinx's conduct, Commerce merely recounted that:

In the Supplemental Section D questionnaire, we requested that Prinx clarify which company operating in a market economy represented the highest level of consolidation with respect to the results of Prinx and to provide a revised financial expense rate calculation based on this market economy company's audited consolidated financial statements. In Prinx's Supplemental Section D Response, Prinx provided the company that it contended was operating in a market economy that represented the highest level of consolidation with respect to the results of Prinx and provided a revised financial expense rate calculation based on this company's FY 2023 audited consolidated financial statements.

*Id.* (P.R. 290). That was it. Commerce provided no explanation or analysis concerning Plaintiff's claims that Prinx failed to cooperate to the best of its ability by repeatedly and knowingly calculating its financial expense ratio based on non-market economy entities – even after Commerce provided Prinx with notice of this deficiency and an opportunity to correct it. Commerce simply stated that it disagreed with Plaintiff, provided a barebones (and misleading)

summary of events, and announced its intention to calculate Prinx's financial expense ratio using neutral facts available.

### III.    STANDARD OF REVIEW

The standard of review requires that the Court sustain any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). In reviewing Commerce's determinations, the court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), but may uphold an agency's action "where the agency's decisional path is reasonably discernable." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *See Huvis Corp. v. United States*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003)).

When determining whether Commerce's interpretation and application of the statute is in accordance with law, the Court is guided by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). In *Loper Bright*, the Supreme Court established a

new standard by which courts resolve questions of statutory interpretation when reviewing challenges to agency action. *Loper Bright* held that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous," *id.* at 413, and rejected the "presum{ption} that statutory ambiguities are implicit delegations to agencies." *Id.* at 399. In so holding, the Supreme Court overruled the deferential standard under the framework that courts previously relied upon to review whether agency action is lawful under the statute the agency is entrusted to administer. *Id.* at 412 ("*Chevron* is overruled."). Instead of deferring to the agency's preferred interpretation of a statute, courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 403. Although the agency's interpretation of the statute may be accorded "due respect," *id.* at 394–95, ultimately courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. The "best reading of the statute" is "the reading the court would have reached if no agency were involved." *Id.* at 400 (internal quotations omitted).

## IV.    SUMMARY OF THE ARGUMENT

When Commerce affirmatively finds that a respondent has cooperated to the best of its ability and, therefore, that the application of AFA is unwarranted, that finding must be reasonable and supported by substantial evidence. In this investigation, Commerce did not meet that standard. When Commerce sought information from Prinx necessary to calculate its financial expense ratio, Prinx responded by providing information based on a non-market economy entity. When Commerce notified Prinx of this deficiency and asked for a calculation based on information from a market economy entity, Prinx responded by providing information from what Prinx had to know was yet another non-market economy entity. As a result of Prinx's

gambit, the record did not contain information that Commerce had sought, requiring the application of facts otherwise available.

In the Final Determination, Commerce agreed that Prinx's reported information was unusable, resulting in a gap in the record. It found, however, that Prinx had cooperated to the best of its ability. As a result, it used neutral facts available to calculate Prinx's financial expense ratio. To support its finding that Prinx was a cooperating respondent, Commerce offered only conclusory statements and did not reconcile the decision it reached with the evidence of Prinx's egregious conduct. Because Commerce failed to support its findings with substantial evidence, its final determination must be remanded.

## V.    ARGUMENT

### A.  Legal Standard

In antidumping proceedings, Commerce issues questionnaires to elicit sales and cost information that it needs to examine a respondent's pricing behavior, and the respondent bears the burden to respond with all the requested information and to create an accurate record. *See ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018) (citing *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016) and *QVD Food Corp. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Respondents selected for individual examination have "a statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1339-40 (Ct. Int'l Trade 2000) (citing *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990)).

When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce, "fails to provide such information…in the

form and manner requested," "significantly impedes a proceeding," or provides information that "cannot be verified," Commerce "shall…use the facts otherwise available." 19 U.S.C. § 1677e(a). Once Commerce determines that the use of facts otherwise available is warranted, if Commerce also "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Further, the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping" and "assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken{.}" *Id.*

However, before Commerce can apply AFA on the basis of a deficient questionnaire response, Commerce must inform the respondent of the deficiency and, to the extent practicable, provide the respondent with an opportunity to rectify the deficiency. *See* 19 U.S.C. § 1677m(d). Commerce satisfies this obligation by issuing a supplemental questionnaire notifying the respondent of the deficiency. *See NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) ("Commerce…satisfied its obligations under section 1677m(d) when it issued a supplemental questionnaire specifically pointing out and requesting clarification of {the} deficient responses.").

Commerce's authority to apply AFA is "an essential investigative tool" to incentivize cooperation because the agency does not have subpoena power. *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021); *see also F. Ili De Cecco*, 216 F. 3d at 1032.

To encourage cooperation, Congress instructed Commerce to apply AFA in a way that would "ensure that the {respondent} does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016) (quoting Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199.

Although Commerce has discretion over whether to apply AFA, Commerce's finding that a respondent has cooperated to the best of its ability must, like Commerce's other findings, be reasonable and supported by substantial evidence. Where this standard is not met, the courts have remanded Commerce's final determinations. *See, e.g.*, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1376-78 (Ct. Int'l Trade 2023) (remanding Commerce's determination that respondent was a cooperating party that did not merit the application of AFA and holding that "Commerce's 'best of its ability' finding must be supported by substantial evidence"); *Tianjin Magnesium Intern. Co., Ltd. v. United States*, 844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) (remanding on similar grounds and noting that Commerce's discretion over the application of AFA is "not without guidance from the courts on what it means for a party to 'cooperate by…acting to the best of its ability.'"). Commerce's finding that a respondent cooperated to the best of its ability – like all other factual findings – must be supported by substantial evidence.

## B. Commerce's Decision to Treat Prinx as a Cooperating Party Was Unreasonable and Not Supported by Substantial Evidence

Prinx plainly did not "cooperate…to the best of its ability" in this investigation. 19 U.S.C. § 1677e(b). Rather, Prinx attempted to improve its dumping margin by repeatedly providing Commerce with deficient information. Prinx was asked twice to report its financial

expense ratio and twice provided expense ratios based on the financial statements of non-market economy entities, despite Commerce's explicit instructions not to do so. Prinx's conduct limited Commerce's ability to calculate an accurate financial expense ratio for Prinx on the basis of market economy information that may have been available, creating a gap in the record.

Commerce does not calculate financial expense ratios on the basis of information from companies "operating in a non-market economy." IDM at 56 (P.R. 290) (citing *Copper Pipe and Tube from Mexico* at Comment 3). This is because Commerce treats prices and costs in a non-market economy as inherently distorted and unreliable. *See BYD (H.K.) Co.,* 785 F. Supp. 3d at 1378 ("The Tariff Act presumes that nonmarket-economy pricing is unreliable{.}"). Prinx attempted to submit a calculation of its financial expense ratio based on information from a company that operated in [        ], a non-market economy. *See* Section D Response at 30 (C.R. 178-196; P.R. 127). Commerce issued a supplemental questionnaire that provided Prinx with "an opportunity to remedy or explain the deficiency" and requested a new financial expense ratio calculation "based on the market economy financial statements{.}" § 1677m(d); Supp. Section D Response at 12 (C.R. 358-385; P.R. 184)

Prinx did not remedy the deficiency. Instead, it submitted a second financial expense ratio calculation based on yet another [        ] company. *See id.* (C.R. 358-385; P.R. 184). That this second company, [              ], operated in a non-market economy was an incontrovertible fact on the record and well-known to Prinx, because it had placed the relevant information on the record itself. *See* Section A Response at Exhibit A-6b-11_2, Exhibit A-2c-2, Exhibit A-6b-9_2, Exhibit A-6b-10_2 (C.R. 55-85; P.R. 107-111); Supp. Section D Response at Exhibit SD-12.b (C.R. 358-385; P.R. 184). In fact, Prinx had reported that [        ], a non-market economy. Section A Response at

13

Exhibit A-6b-11_2 (C.R. 55-85; P.R. 107-111). Prinx, therefore, manifestly did not "cooperate to the best of its ability" or "put forth its maximum effort to provide Commerce with full and complete answers" to Commerce's inquiries regarding Prinx's financial expense ratio. *Nippon Steel*, 337 F.3d at 1382. Simply put, a party that "cooperated to the best of its ability" would never have provided [                    ] information when asked for "market economy financial statements." 19 U.S.C. § 1677e(b); Supp. Section D Response at 12 (C.R. 358-385; P.R. 184).

Nonetheless, Commerce found that Prinx had cooperated "to the best of its ability to provide information in the form and manner requested by Commerce{.}" IDM at 55 (P.R. 290). As a result, Commerce declined to apply AFA and instead filled the gap in the record created by Prinx's non-market economy financial expense ratio calculation with neutral "facts otherwise available." *Id.* at 56 (P.R. 290). Commerce did not supply any reasoning for its decision. It merely made a conclusory statement that Prinx "provided the company that it contended was operating in a market economy that represented the highest level of consolidation with respect to the results of Prinx and provided a revised financial expense rate calculation based on this company's FY 2023 audited consolidated financial statements." *Id.* (P.R. 290). If "contending" a baseless proposition is enough to satisfy the "best of its ability" standard, then there is no standard at all.

Indeed, the basis of Prinx's "contention" was transparently meritless. As an initial matter, once Commerce had alerted Prinx that its first attempt to calculate its financial expense ratio on the basis of [                    ], was deficient, Prinx was on notice that such companies would not qualify as sources for the "market economy financial statements" that Commerce requested. *See* Supp. Section D Response at 12 (C.R. 358-385; P.R. 184). To submit

the financial information of yet another [          ] company in the face of Commerce's clear instruction was not a good faith "contention." It was a knowing attempt to prevent Commerce from calculating Prinx's financial expense ratio on a market economy basis. Indeed, the only reasonable inference that can be drawn from Prinx's conduct is that – if it had cooperated and complied with Commerce's request – the information from the company at the highest level of consolidation that was operating in a market economy would have resulted in a much higher INTEX ratio.

In the proceedings below, Prinx attempted to excuse its noncooperation by first asserting that Commerce had already accepted Prinx's financial expense ratio calculation. *See* Rebuttal Brief at 25 (C.R. 564, P.R. 279). Prinx argued that "Petitioner did not challenge the Department's reliance on this report in a timely manner" and that Commerce "did not ask Prinx to submit additional information regarding the report in a second supplemental questionnaire{.}" *Id.* (C.R. 564, P.R. 279). Of course, a timely-submitted case brief raising an issue contained in Commerce's preliminary determination is a quintessential "challenge" to Commerce's calculation method. *See* Case Brief (C.R. 563, P.R. 277). And the statute is clear that, after Commerce has already provided the respondent with notice of its deficient reporting, Commerce is not required to give third chances to cooperate when the respondent doubles down and repeats its error. *See* § 1677m(d) (providing that after Commerce "provide{s} {the respondent} with an opportunity to remedy or explain the deficiency," if Commerce "finds that such response is not satisfactory," then Commerce "may, subject to subsection (e), disregard all or part of the original and subsequent responses").

Prinx also contended that [                    ] did not, in fact, operate in a non-market economy because the company [

] Rebuttal

Brief at 25 (C.R. 564, P.R. 279). However, as the standard to which both Plaintiff and Commerce

cited makes clear, it is enough for the company in question to "operate" in a non-market

economy. *See* IDM at 56 (P.R. 290); Case Brief at 39 (C.R. 563, P.R. 277). (both citing to

*Seamless Copper Pipe from Mexico* at Comment 3). Because it was clear on the record that

[                    ] did not merely operate in a non-market economy but had its [

          ] in one, this was not a debatable issue – the company's [

                                        ] notwithstanding. *See* Section A Response

at Exhibit A-6b-11_2 (C.R. 55-85; P.R. 107-111) (emphasis added). Indeed, Commerce has

never treated [                                        ] as sufficient to establish the non-market

ownership of a company, let alone whether it "operates" in an NME. *See, e.g.*, *Certain Carbon

and Alloy Steel Cut-to-Length Plate from the People's Republic of China*, *Final Affirmative

Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 8,510 (Dep't Commerce Jan. 17,

2017) and accompanying Issues and Decision Memorandum at Comment 2. And if

[                                        ] conferred market economy status, Commerce's inquiry

would be utterly futile.

Finally, Prinx argued that [

                                        ]" Rebuttal Brief

(C.R. 564, P.R. 279). But in order to make this argument, Prinx [

                                        ] and further confirming that the company was a non-

market economy entity. *Id.* at 25-26 (C.R. 564, P.R. 279).

The bottom line is that all the record evidence showed that Prinx repeatedly calculated its financial expense ratio on the basis of companies that operated in non-market economies, despite receiving notice from Commerce that it should calculate the ratio based on companies operating in market economies. This conduct fell far short of Prinx's "maximum effort." *Nippon Steel*, 337 F.3d at 1382. Instead of following Commerce's instructions, Prinx found yet another company operating in a non-market economy, creating what Commerce acknowledged to be a gap in the record. IDM at 56 (P.R. 290). This violated Prinx's "statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d at 1339-40. Yet Commerce summarized Prinx's conduct, in conclusory fashion, as Prinx "contend{ing}" a matter that was in fact frivolous to contend, and treated it as a cooperating party for purposes of the financial interest expense calculation.

Commerce's conclusory finding of Prinx's cooperation is especially glaring because of the agency's concession that Plaintiff was *correct* on the merits regarding the financial expense ratio. Commerce's IDM stated that:

> While Commerce's established practice is to calculate the respondent's financial expense ratio based on the audited financial statements of the highest level of consolidation available, Commerce does not rely on the financial statements of companies operating in a non-market economy (NME). After further review of the information on the record of this proceeding, we agree with the petitioner that this company's consolidated financial statements cannot serve as the basis for Prinx's financial expense ratio calculation in the final determination because this company also operates in an NME.

IDM at 56 (P.R. 290). However, Commerce made no attempt to reconcile this finding with its separate finding that Prinx was a cooperating party. On the latter finding, Commerce supplied no reasoning at all.

In analogous circumstances, this Court has required Commerce to support its finding that a party has cooperated to the best of its ability with reasoned analysis and has remanded

Commerce's determinations where the agency has failed to do so. In *Assan Aluminyum*, this Court remanded Commerce's final determination because the agency had failed to provide substantial evidence in support of its finding that the respondent had cooperated to the best of its ability with Commerce's requests for information regarding the respondent's billing adjustments. *See Assan Aluminyum*, 624 F. Supp. 3d at 1377-78. Specifically, the Court found that it was not "'reasonably discernible' what evidence supports the agency's conclusions that 'Assan…cooperated with Commerce's requests for…information and…answered each request for…information to the best of its ability – the crux of Commerce's proffered rationale." *Id.* at 1377. The Court found Commerce's "conclusory statement" that the respondent had cooperated to the best of its ability especially insufficient in light of Commerce's simultaneous enumeration of evidence that detracted from this conclusion, "without any attempt to reconcile" this contrary evidence. *Id.* Although affirming Commerce's discretion over whether to apply AFA based on a finding of noncooperation, the Court concluded that Commerce's "affirmative factual finding" that the respondent was a cooperating party "must be supported by substantial evidence," yet it was "not reasonably discernible that the agency's determination is so supported." *Id.* at 1378.

Similarly, in *Tianjin Magnesium*, the Court remanded Commerce's finding that the respondent had cooperated to the best of its ability and that the application of AFA was unwarranted. The Court first recited the *Nippon Steel* explanation of the "best of its ability" standard – *i.e.*, that the standard does not condone inattentiveness, carelessness, or inadequate record keeping, and assumes that importers are familiar with the rules and regulations that apply to its import activities – and cited *Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F. Supp. 2d 1339, 1345 (Ct. Int'l Trade 2005) for the proposition that "the adverse inferences standard is met 'where a respondent purposefully withholds, and provides misleading,

information.'" The Court then found that Commerce had failed to supply a reasonable basis for its decision to discount the respondent's behavior that violated this standard and to treat the respondent as a cooperating party. Specifically, the Court determined that:

> Commerce never address{ed} the conduct by Tianjin that is squarely violative of the obligations outlined in the cases above and that "Commerce was required to set forth its reasons for discounting out of hand conduct that went well beyond 'inattentiveness, carelessness, or inadequate record keeping.' If such reasons were provided, Commerce would also need to reconcile them with the cases set forth above affirming that where a party provides inaccurate or misleading information, it has not cooperated to the best of its ability.

*Tianjin Magnesium*, 844 F. Supp. 2d at 1347.

Commerce did not meet the standard required by *Assan Aluminyum* and *Tianjin Magnesium*. In the present case, Prinx knowingly flouted Commerce's instructions to report its financial expense ratio on the basis of market economy financial statements. Prinx instead "provide{d} inaccurate or misleading information" by insisting on calculating its financial expense ratio on the basis of non-market economy financial statements. Despite Commerce's acknowledgment that Prinx's conduct had created a gap in the record, Commerce provided no reasons for rejecting Plaintiff's "contention" that Prinx had failed to cooperate to the best of its ability. The agency did not reconcile Prinx's conduct with the conclusion it reached, making it impossible to reasonably discern the basis for Commerce's decision. Commerce therefore failed to provide substantial evidence to support its finding that Prinx had cooperated with its requests for information regarding its financial expense ratio and that the use of AFA to calculate this ratio was not warranted.

Commerce's decision in this case – if left to stand – would severely erode the authority vested in the agency by Congress to induce cooperation by respondents. *See, e.g., KYD, Inc.  v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (discussing the purpose of adverse inferences

as "the means Congress intended for Commerce to use to induce cooperation with its anti-dumping investigations"). When Commerce asks respondents to provide relevant information, they face the choice of cooperating to the best of their ability by providing accurate information or, alternatively, providing inaccurate information that is favorable to the calculation of their dumping margin based on a "contention" that the information is accurate and responsive. If Commerce blindly accepts baseless contentions of accuracy, however, as it did here, respondents will never be induced to put forth their maximum efforts to provide accurate information. Instead, they will be incentivized to roll the dice by providing inaccurate information – secure in their belief that so long as they "contend" the information is accurate, Commerce will find they have been cooperative. This flies in the face of the enforcement regime established by Congress.

## VI.    CONCLUSION

For these reasons, Plaintiff respectfully asks this Court to remand Commerce's Final Determination in accordance with the arguments provided above.

Respectfully submitted,

 /s/ Luke A. Meisner
Roger B. Schagrin
Elizabeth J. Drake
Luke A. Meisner
Nicholas C. Phillips*

**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to USW*

*Admitted only in New York. Practice
limited to matters before federal courts and
agencies.

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief contains 6,495 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated:  October 3, 2025                              /s/ Luke A. Meisner

                                                                           Luke A. Meisner