### UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) Court No. 25-00004 ) |
| UNITED STATES, | ) **PUBLIC VERSION** ) |
| *Defendant,* | ) **Business proprietary information** ) **redacted from pp. 1, 4-12.** |
| and | ) ) |
| PRINX CHENGSHAN TIRE (THAILAND) CO., LTD., | ) ) ) |
| *Defendant-Intervenor.* | ) ) ) |

### PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION
### FOR JUDGMENT ON THE AGENCY RECORD

<div style="margin-left:40%">

Roger B. Schagrin
Luke A. Meisner
Elizabeth J. Drake
Nicholas C. Phillips*
**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
*Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

*Admitted only in New York. Practice limited to matters before federal courts and agencies.

</div>

March 6, 2026

## **TABLE OF CONTENTS**

I.   COMMERCE'S "BEST OF ITS ABILITY" FINDING MUST BE REASONABLE........... 1

II.  COMMERCE FAILED TO PROVIDE A REASONABLE EXPLANATION FOR ITS FINDING ................................................................................................................. 3

III. COMMERCE'S FINDING WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.. 7

IV.  CONCLUSION ................................................................................................................ 12

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AK Steel Corp. v. United States*,

  346 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2004) .................................................................... 2

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,

  624 F. Supp. 3d 1343, 1377-78 (Ct. Int'l Trade 2023) ............................................................ 1

*BYD (H.K.) Co., Ltd v. United States*,

  785 F. Supp. 3d 1359, 1378 (Ct. Int'l Trade 2025) ................................................................ 10

*In re Section 301 Cases*,

  570 F. Supp. 3d 1306, 1338 (2022) ......................................................................................... 2

*Nippon Steel Corp. v. United States*,

  337 F.3d 1373, 1383 (Fed. Cir. 2003) ...................................................................................... 7

**Statutes**

19 U.S.C. § 1677m(d) ................................................................................................................... 8, 9

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the People's Republic of China*

  (Jan. 17, 2017) *Issues and Decision Memorandum for the Final Affirmative Determination*

  *in the Less-Than-Fair-Value Investigation* at Comment 2 ...................................................... 9

*Seamless Refined Copper Pipe and Tube from Mexico: Final Results of Antidumping Duty*

  *Administrative Review: 2012-2013*, 80 Fed. Reg. 33,482 (June 12, 2015) ............................ 4

On behalf of Plaintiff the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Plaintiff or "USW"), we hereby submit this reply brief in support of Plaintiff's motion for judgment on the agency record in the above-captioned action. For the reasons discussed below, there is no merit to the arguments raised in the response briefs of the United States ("the Government" or "Defendant") or Prinx Chengshan Tire (Thailand) Co., Ltd. ("Prinx" or "Defendant-Intervenor"). *See* Defendant's Response to Plaintiff's Motion for Judgment upon the Agency Record (Dec. 23, 2025), ECF 36-37 ("Gov. Br."); Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the Agency Record Pursuant to USCIT Rule 56.2 (Feb. 6, 2026), ECF 38-39. ("Prinx Br.") Accordingly, the Court should hold that the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping investigation of truck and bus tires from Thailand is not supported by substantial evidence on the record and not otherwise in accordance with the law. The Court should therefore remand this matter to Commerce for disposition consistent with the decision of this Court.

## I.    COMMERCE'S "BEST OF ITS ABILITY" FINDING MUST BE REASONABLE

This case comes down to a simple question: whether Commerce's finding that Prinx cooperated to the best of its ability regarding the calculation of its financial expense ratio was reasonable. As established in Plaintiff's opening brief, it was not. *See* Plaintiff's Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record (Oct. 3, 2025), ECF 32-33 ("Pl. Br."). After Prinx attempted to report its financial expense ratio on the basis of financial statements from [

], Commerce notified Prinx of the deficiency and asked for financial statements from a market economy entity. Prinx responded by providing the financial statements of [

], according to information Prinx itself placed on the record. *See* Section A Response at Exhibit A-6b-11_2 (C.R. 55-85; P.R. 107-111). Prinx's deficient reporting created a gap in the record, requiring Commerce to calculate the financial expense ratio for Prinx using facts otherwise available. These facts are not in dispute, and they do not reflect the actions of a respondent cooperating to the best of its ability.

The Government attempts to argue that Commerce's application of an adverse inference to the facts otherwise available ("AFA") was left to the agency's discretion. *See* Def. Br. at 11 ("Commerce enjoys broad discretion in determining whether to apply an adverse inference."). But this places the cart before the horse. Although Commerce may decide whether to apply an adverse inference to a respondent at its discretion, such a decision must rest on an "affirmative factual finding" that the respondent did or did not cooperate to the best of its ability with Commerce's requests for information. *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1377-78 (Ct. Int'l Trade 2023). Like all of Commerce's factual findings, a finding that a respondent cooperated to the best of its ability must be reasonable and supported by substantial evidence. *See id.* at 1378. The Government therefore aims at the wrong target – Plaintiff does not challenge Commerce's discretion over whether to apply an adverse inference. Rather, Commerce's discretion to apply an adverse inference depended on the agency's antecedent finding that "Prinx cooperated to the best of its ability to provide the information requested." IDM at 41 (P.R. 290). Commerce does not have the discretion to make such a finding in the absence of a reasonable explanation and substantial evidence. Commerce provided neither.

Nor is it availing that Commerce need not "prove that an importer cooperated to the best of its ability every time that the agency decides not to apply adverse facts available." Gov. Br. at

11 (citing *AK Steel Corp. v. United States*, 346 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2004)).

Indeed, Commerce is not required to "prove" anything in an antidumping investigation. Rather,

when it makes a finding on the basis of the record the parties have built, that finding must be

reasonable and supported by substantial evidence. Where the question of a party's cooperation

has been raised before the agency, mere "conclusory statement{s} that do not explain how a

determination was reached are…insufficient." *Assan Aluminyum*, 624 F. Supp. 3d at 1377

(quoting *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1338 (2022)). If Commerce determines

that a party has cooperated to the best of its ability "without any attempt to reconcile…evidence

that seemingly detracts from this conclusion," Commerce's determination cannot stand. *Id.*

## II.     COMMERCE FAILED TO PROVIDE A REASONABLE EXPLANATION FOR ITS FINDING

That is what happened here. The sum total of Commerce's discussion of Prinx's

cooperation with Commerce's requests for financial expense information was as follows:

> In the Supplemental Section D questionnaire, we requested that Prinx clarify
> which company operating in a market economy represented the highest level of
> consolidation with respect to the results of Prinx and to provide a revised financial
> expense rate calculation based on this market economy company's audited
> consolidated financial statements. In Prinx's Supplemental Section D Response,
> Prinx provided the company that it contended was operating in a market economy
> that represented the highest level of consolidation with respect to the results of
> Prinx and provided a revised financial expense rate calculation based on this
> company's FY 2023 audited consolidated financial statements.

IDM at 56 (P.R. 290). It is not reasonably discernible why Prinx's "contention" of a matter

constitutes cooperation to the best of its ability. Commerce provided no explanation or analysis

concerning the evidence that Plaintiff highlighted showing that Prinx failed to cooperate to the

best of its ability by repeatedly and knowingly calculating its financial expense ratio on the basis

of non-market economy entities – even after Commerce provided Prinx with notice of this

deficiency and an opportunity to correct it. As Plaintiff has explained, the company that Prinx

"contended was operating in a market economy" had its "[

                              ]," according to information Prinx itself placed on the record. *See*

Section A Response at Exhibit A-6b-11_2 (C.R. 55-85; P.R. 107-111). Mere contention of a

matter that is baseless to contend cannot be cooperation to the best of one's ability.

     The Government and Prinx raise various arguments for why Commerce's explanation

was in fact sufficient. Each of these arguments is meritless.

     First, both parties repeatedly reference Commerce's explanation of its decision not to

apply total AFA to Prinx. *See* Gov. Br. at 5, 12; Prinx Br. at 7. There, Commerce wrote that

"Prinx cooperated with Commerce's numerous requests for information, provided the requested

information by the established deadlines in the form and manner requested, provided information

that was largely verifiable, and did not significantly impede Commerce's ability to timely and

accurately conduct this investigation so as to warrant {} application of total AFA." IDM at 41

(P.R. 290). However, Plaintiff does not challenge Commerce's decision not to apply *total* AFA

to Prinx. Plaintiff challenges Commerce's finding that Prinx cooperated to the best of its ability

specifically regarding the calculation of Prinx's financial expense ratio, which was an issue of

*partial* AFA.

     Whether a party merits the application of total AFA – *i.e.*, the rejection of all information

the respondent has supplied to Commerce – is a separate determination. Indeed, the Government

notes that Commerce's finding on total AFA was made "other than with regard to a few discrete

issues for which Commerce applied partial AFA{.}" Gov. Br. at 12. The total AFA explanation

is therefore unresponsive to the discrete issue that Plaintiff raised. In any event, Commerce's

"explanation" was a simple recitation of the statutory formula for AFA and did not address any

specific arguments, let alone arguments concerning the calculation of Prinx's financial expense

ratio. It is telling that both the Government and Prinx feel the need to cite to this explanation to bolster the bare-bones discussion that Commerce actually did provide on the specific financial expense issue that is the subject of this litigation.

Second, the Government and Prinx reference Commerce's discussion of issues related to the financial expense ratio calculation that were only ancillary to the question of Prinx's cooperation. Specifically, the parties note that "Commerce explained that using Prinx Thailand's financial statements was consistent with its relying on a producer-respondent's own financial statements in prior cases with similar fact patterns" and that Commerce cited to *Seamless Refined Copper Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review: 2012-2013*, 80 Fed. Reg. 33,482 (Dep't Commerce June 12, 2015). Prinx Br. at 8; *see also* Gov. Br. at 11-12. Yet the fact pattern in *Seamless Refined Copper Pipe* is dissimilar in the most important respect – the proceeding involved no discussion of a respondent's lack of cooperation or the application of AFA. The proceeding simply stands for the proposition that Commerce does not calculate financial expense ratios on the basis of non-market economy financial statements, such as those that Prinx repeatedly supplied. *Seamless Refined Copper Pipe* cannot be cited to support an explanation or analysis as to why Commerce found that Prinx cooperated to the best of its ability, because the respondent's cooperation was not at issue in that case.

Third, the Government claims that Commerce "identified record information supporting Prinx's position, finding that [                    ] financial statements are prepared in accordance with [                              ] and that the company was incorporated in [                    ]." Gov. Br. at 11. The text that the Government references does not appear in the IDM, but rather in Commerce's Final Cost Calculation Memorandum. This document sets forth the changes made to the calculation of Prinx's costs between the

Preliminary Determination and the Final Determination. *See* Commerce Memorandum re: *Cost*

*of Production and Constructed Value Calculation Adjustments for the Final Determination –*

*Prinx Chengshan Tire (Thailand) Co., Ltd.* (Oct. 9, 2024) ("Final Cost Calculation Memo") (P.R.

293, C.R. 570). The full text from that memorandum, from which the Government cites, states:

> While Commerce's established practice is to calculate the respondent's financial
> expense ratio based on the audited financial statements of the highest level of
> consolidation available, Commerce does not rely on the financial statements of
> companies operating in a non-market economy (NME). After further reviewing
> the information on the record of this proceeding, we found that [
>                        ]'s consolidated financial statements are prepared in accordance with
> [                                        ] and state that the company was
> incorporated in [                        ]. However, the financial statements also state
> that [
>                                        ]. Further, the financial statements of one of
> [                        ]'s affiliates, [                                ],
> state that [                        ]'s principal place of business and country of
> incorporation [                                                ].… Therefore,
> because the record shows that [                        ] operates in [            ], we agree
> with the petitioner that its consolidated financial statements cannot serve as the
> basis for Prinx's financial expense ratio calculation. As such, for the final
> determination as facts otherwise available, we relied on Prinx's FY 2023 audited
> financial statements as the basis for the financial expense ratio calculation.

Final Cost Calculation Memo at 2-3 (P.R. 293, C.R. 570).

   This recounting of record evidence leaves out any discussion of the finding that Plaintiff

challenges: Commerce's finding that Prinx had cooperated to the best of its ability with respect

to its financial expense ratio and therefore did not merit the application of AFA. That finding

was made in Commerce's IDM, which is the document in which Commerce explains the

reasoning behind its determinations. The issue of the application of AFA is not addressed in the

Final Cost Calculation Memo, a document which plays no such role and is not the venue for

Commerce's explanation of AFA decisions. Indeed, the Final Cost Calculation Memo fails to

even raise or address Plaintiff's key question: why, given that Prinx had notice of the need to

calculate its financial expense ratio on the basis of a market economy entity, did Commerce find

that Prinx had cooperated to the best of its ability even after Prinx had created a gap in the record by submitting non-market economy entity information for a second time?

Ultimately, Commerce's finding was based on the fact that "Prinx had submitted information for the company it *maintained* both operated in a market economy and represented the highest level of consolidation with regard to Prinx." Gov. Br. at 11 (emphasis added). That is, the load-bearing element of Commerce's analysis in the IDM was that "Prinx provided the company that it *contended* was operating in a market economy that represented the highest level of consolidation with respect to the results of Prinx{.}" IDM at 56 (P.R. 290) (emphasis added). This, however, is a conclusory statement that does not render Commerce's decision-making path reasonably discernible.

Parties can "maintain" or "contend" anything. Blind acceptance of such contentions does not constitute reasonable decision-making. Here, it was inarguable that [

], as Commerce ultimately found. The mere fact that Prinx contended otherwise cannot be the basis of a finding that Prinx cooperated to the best of its ability. Indeed, the only reasonable inference that can be drawn from Prinx's "contention" is that it feared that calculating its financial expense information on the basis of market economy financial statements would negatively impact its dumping margin. That is the opposite of cooperation. If contending a baseless proposition is enough to satisfy the "best of its ability" standard, it would eviscerate that standard and create far-reaching implications for Commerce's administration of the antidumping law.

## III. COMMERCE'S FINDING WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In addition to arguing that Commerce's explanation was reasonable, the Government and Prinx argue that it was supported by substantial evidence. These arguments largely consist of

post-hoc rationalizations not included in Commerce's actual finding, as well as inaccuracies that are not substantiated by the record in this investigation. The Court should therefore reject these arguments.

First, Prinx's keystone argument is apparently that Prinx's non-market economy information had already been "accepted by Petitioner and Commerce throughout the investigation{}." Prinx Br. at 8; *see also id.* at 9, 11. Prinx's theory is that "Petitioner did not raise the issue as to whether [                ] was a market economy company until it filed its Case Brief – after the record was closed." *Id.* at 8-9. Indeed, Prinx asks, "{i}f Petitioner disagreed with Prinx's position, it had multiple opportunities – before the record closed – to ask that Commerce reject the [                ] statement." *Id.* at 11. Prinx's pseudo-forfeiture argument did not form any part of Commerce's determination because it has no basis in the law. A timely-filed case brief is an appropriate and common means to raise issues with Commerce's preliminary determination, including issues that have not been raised prior to the preliminary determination. Prinx can cite no legal authority for its position that its deficient reporting had already been "accepted" by virtue of the timing of Plaintiff's challenge, because no such authority exists. In fact, Plaintiff's challenge was timely, a fact confirmed by Commerce's ultimate finding that [                                ] and the agency's subsequent rejection of Prinx's reporting. Prinx's claim that its information had been "accepted by… Commerce throughout the investigation" is, therefore, grossly inaccurate.

Second, the Government concentrates its efforts on an intent-based argument, claiming that although Prinx's information was unusable, this "does not mean that Prinx intentionally misled Commerce or believed at the time it submitted the supplemental questionnaire response that the company operated in a non-market economy." Gov. Br. at 12. This, too, formed no part

of Commerce's original analysis, perhaps because it is axiomatic that there is no intent requirement in the AFA statute. *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003) ("While intentional conduct…surely evinces a failure to cooperate, the statute does not contain an intent element."). It does not matter whether Prinx "intentionally misled" Commerce or "believed at the time…that the company operated in a non-market economy." Rather, "{t}he statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.*

That said, it defies belief that Prinx did not "believe{} at the time" that [

] "operated in a non-market economy." Prinx was surely aware that [

], because Prinx itself placed that information on the record. *See* Section A Response at Exhibit A-6b-11_2 (C.R. 55-85; P.R. 107-111).

Third, the Government postulates that perhaps Prinx had not been fully placed on notice by Commerce, because the agency's supplemental questionnaire did not specify "whether the revised financial statements from the consolidated company had to operate *only* in a market economy, or make clear that Commerce was aware that the parent company operated in [      ]." Nor did Commerce "issue another deficiency notice to Prinx pursuant to 19 U.S.C. § 1677m(d)." Gov. Br. at 13.

The Government's notice theory is yet another post-hoc rationalization that is absent from Commerce's final determination and therefore cannot constitute substantial evidence supporting the agency's findings. Regardless, the theory is meritless. Although it is true that [

] that Prinx originally

submitted and Commerce rejected. *See* Section A Response at Exhibit A-6b-9_1; A-6b-9_2; A-6b-9_3 (C.R. 55-85; P.R. 107-111) (reporting that [


]). By rejecting [                    ] financial statements and asking for market economy financial statements instead, Commerce placed Prinx on notice that [            ] companies were not acceptable, [                                        ].

 Commerce was also not required to issue yet another deficiency notice after its first one was ignored. The statute is clear that, after Commerce has already provided the respondent with notice of its deficient reporting, Commerce is not required to give third chances to cooperate when the respondent doubles down and repeats its error. *See* § 1677m(d) (providing that after Commerce "provide{s} {the respondent} with an opportunity to remedy or explain the deficiency," if Commerce "finds that such response is not satisfactory," then Commerce "may…disregard all or part of the original and subsequent responses.").

 Ultimately, the Government and Prinx are left with the theory that Commerce's cooperation finding was reasonable because [                    ] "arguably operated in a market economy." Gov. Br. at 13; *see also* Prinx Br. at 10 ("Prinx's reasonable belief that [

] was a market economy company was based on…multiple objective facts."). In fact, Prinx's "belief" was neither arguable nor reasonable. Following the rejection of [

], the only basis for Prinx's supposed belief was [


]. But these legal formalisms simply have no bearing on whether or not a company "operat{es} in a non-market economy." Gov. Br. at 3. Indeed, Plaintiff's opening brief cited to Commerce's previous finding that even [

10

]. *See* Pl. Br. at 16 (citing

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the People's Republic of China*, *Final Affirmative Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 8,510 (Dep't Commerce Jan. 17, 2017) and accompanying Issues and Decision Memorandum at Comment 2). And, if mere [                                        ] was enough to confer market economy status, the very concept of a "market economy" entity would be meaningless.

These attempted defenses fly in the face of Commerce's long-standing policy regarding financial statements from non-market economy companies. Commerce rejects financial statements from non-market economy companies because "the Tariff Act presumes that nonmarket-economy pricing is unreliable." *BYD (H.K.) Co., Ltd v. United States*, 785 F. Supp. 3d 1359, 1378 (Ct. Int'l Trade 2025). Accordingly, as Commerce instructed and as the Government conceded in its brief, it is the company's operation in a non-market economy that is relevant, and not the location of the company's [                              ]. *See* Gov. Br. at 3 ("Commerce does not rely on the financial statements of companies operating in a non-market economy. Because Prinx's parent company was located in and operated in [      ], a non-market economy, Commerce asked Prinx…to provide a revised financial expense rate calculation based on {} market economy financial statements."). A company whose [

] would be able to take advantage of non-market economy pricing, whether or not it was [                                                    ]. It most certainly "operates" in a non-market economy. The proposition is not "arguabl{e}." Gov. Br. at 13.

Taking the record as a whole, Prinx's decision to answer Commerce's request for "market economy financial statements" with statements from a company whose "[

11

]" constituted a failure by Prinx to cooperate to the best of its ability. It was therefore unreasonable for Commerce to find that Prinx had cooperated to the best of its ability, and that conclusion was not supported by substantial evidence.

## IV.     CONCLUSION

For these reasons, Plaintiff respectfully asks this Court to remand Commerce's Final Determination in accordance with the arguments provided above.

Respectfully submitted,

 /s/ Luke A. Meisner
Roger B. Schagrin
Elizabeth J. Drake
Luke A. Meisner
Nicholas C. Phillips*

**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to USW*

*Admitted only in New York. Practice limited to matters before federal courts and agencies.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief contains 3,593 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


Dated:  March 6, 2026                           /s/ Luke A. Meisner
                                                   Luke A. Meisner